Filed 3/14/16 Certified for Publication 3/25/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN PAUL FLOREZ,<br><br>    Defendant and Appellant. | H040327<br>(Santa Clara County<br>Super. Ct. No. C9890809) |

Defendant John Paul Florez is currently serving a "Three Strikes" sentence. Following the passage of Proposition 36, the Three Strikes Reform Act, he filed a petition for resentencing under Penal Code section 1170.126.[1]  Although he was eligible to be resentenced based on his current and past offenses, the trial court exercised its discretion to find that resentencing him "would pose an unreasonable risk of danger to public safety" (§ 1170.126, subd. (f)) and denied his petition. Defendant appealed. For the reasons set forth below we find no merit in any of defendant's arguments on appeal and affirm the order denying his petition.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1998, police officers saw defendant urinating behind a convenience store in San Jose. Officers believed defendant dropped something on the ground. Shortly thereafter, officers discovered a small bag containing 0.19 grams of cocaine near where defendant

---

[1] Unspecified statutory references are to the Penal Code.

had been standing. Officers also determined that defendant was under the influence of opiates and cocaine.

In 1999, defendant pleaded guilty to a felony for possession of a cocaine base and a misdemeanor for being under the influence. He also admitted he had been convicted of four prior strike convictions within the meaning of the former Three Strikes Law and that he had served three prior prison terms. Following his plea, the trial court sentenced defendant to a term of 25 years to life and an additional three years for his prior prison terms.

Defendant's prior strike convictions were for robbery. In 1990, defendant put a knife to a victim's throat, pulled the victim out of a car, beat the victim, and took the victim's car. In 1983, defendant placed a knife to the throat of a 7-Eleven store employee and demanded money. In 1976, defendant robbed two different convenience stores.

On January 14, 2013, defendant filed a petition for resentencing under section 1170.126. At the time he filed the petition, defendant was 63 years old and had served 15 years of his prison sentence.

The People opposed defendant's petition, conceding that his offenses rendered him eligible for resentencing under section 1170.126 but arguing that resentencing him would pose an unreasonable risk of danger to public safety. Attached to the People's opposition were defendant's prison records, which reflected that he had been involved in fights and altercations while incarcerated. The latest incident involving violence took place in 2009.

On October 18, 2013, defendant filed a response to the People's opposition to his petition for resentencing. In his response, defendant argued that the dangerousness finding must be submitted to a jury.

On October 22, 2013, the court held a hearing and heard evidence and argument regarding defendant's petition.[2]  Defendant had an expert testify that recidivism reduces with age, and the recidivism rate of a third strike inmate of defendant's age was about 1 percent.  Defendant had not abused substances since his incarceration.  He had also been accepted into a transitional program.  One of defendant's relatives spoke during the hearing, describing that defendant would receive support if resentenced and released.

Afterwards, the court denied defendant's petition, finding that resentencing him would pose an unreasonable risk of danger to public safety.  The court noted that defendant had broken rules in prison and had been involved in fights and altercations, even after he was considered elderly.  Further, the court asserted that it was especially troubling that it appeared that defendant had not participated in programming to address his problem areas, such as anger management or substance abuse.  Defendant appealed.

## DISCUSSION

1. *Petition for Resentencing*

a. **Statutory Background**

In November 2012, California voters approved Proposition 36, the Three Strikes Reform Act of 2012 (hereafter the Reform Act).  Prior to the passage of Proposition 36, the former Three Strikes law (§§ 667, subds. (b)-(i), 1170.12) mandated that a defendant who is convicted of two prior serious or violent felonies would be subject to a sentence of 25 years to life upon conviction of a third felony.  The Reform Act amended the three strikes law.  Now, section 1170.12, subdivision (c)(2)(C) and section 667, subdivision (e)(2)(C) provide that a defendant with two or more strikes who is convicted

---

[2] The court did not explicitly rule on defendant's request for a jury trial.  However, since it held a hearing on the matter without a jury, it implicitly denied defendant's request.

of a felony that is neither serious nor violent be sentenced as a second strike offender, unless certain exceptions apply.

The Reform Act also added section 1170.126, which allows eligible inmates who are currently subject to 25-years-to-life sentences under the former three strikes law to petition the court for resentencing. "Section 1170.126, subdivisions (a) and (b), broadly describe who is eligible to file a petition and to be resentenced. Subdivision (a) of section 1170.126 states: 'The resentencing provisions under this section and related statutes *are intended to apply exclusively* to persons presently serving an indeterminate term of imprisonment pursuant to paragraph (2) of subdivision (e) of Section 667 or paragraph (2) of subdivision (c) of Section 1170.12, *whose sentence under this act would not have been an indeterminate life sentence*.' " (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 598.) "Subdivision (b) of section 1170.126 states: 'Any person serving an indeterminate term of life imprisonment imposed pursuant to paragraph (2) of subdivision (e) of Section 667 or paragraph (2) of subdivision (c) of Section 1170.12 upon conviction, whether by trial or plea, of a felony or felonies *that are not defined as serious and/or violent felonies* by subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7, *may file a petition for a recall of sentence*. . . .' " (*Id*. at p. 599.)

An eligible prisoner "shall be resentenced" as a second strike offender unless the court determines that resentencing him or her "would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) In exercising its discretion under section 1170.126, subdivision (f), the trial court may consider various factors including the petitioner's criminal conviction history, disciplinary record and record of rehabilitation while incarcerated, and "[a]ny other evidence the court . . . determines to be relevant . . . ." (*Id*., subd. (g)(3).)

4

b. **Scope of the Court's Discretion**

On appeal, defendant argues that the court erred when it denied his petition for resentencing, because it failed to understand that section 1170.126 creates a presumption in favor of reducing an eligible petitioner's sentence. Defendant also claims that the court erred when it failed to consider the limits on its discretion imposed by the Reform Act, which he argues created a new sentencing norm.

Section 1170.126, subdivision (f) states in pertinent part that "the petitioner *shall* be resentenced pursuant to [a second-strike term] *unless* the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (Italics added.) Defendant maintains that "[s]ome statutes contain express qualifications delineating, and thereby restricting, the particular exercise of discretion" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977); therefore, the "shall/unless" language establishes a presumption in favor of resentencing a petitioner that can only be overcome if the court finds the petitioner would present an unreasonable risk of danger to public safety.

In part, defendant cites to statutes relating to the grant or denial of parole. He argues that *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 held that there was a statutory presumption in favor of parole based on the "shall/unless" language in section 3041. Section 3041 states that the board "shall set a release date [for the inmate] unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (§ 3041, subd. (b).)

To an extent, we disagree with defendant's interpretation of *Rosenkrantz* and section 3041. The statutes and regulations governing parole create a presumption in favor of parole in part because of the Legislature's conclusion that those prisoners who

5

have served their minimum parole eligibility terms are "normally" entitled to a parole date unless parole poses an unreasonable risk to public safety. (§ 3041, subd. (a).) Therefore, we disagree with defendant's interpretation that *Rosenkrantz* concluded that, *by itself*, the "shall/unless" construction used in section 3041 created a presumption in favor of parole.

Additionally, we find that defendant's interpretation of the "shall/unless" statutory construction was recently rejected by our Supreme Court in *People v. Gutierrez* (2014) 58 Cal.4th 1354, which analyzed similar language located in section 190.5, the juvenile life without parole statute. The *Gutierrez* court stated: "Contrary to [*People v. Guinn* (1994) 28 Cal.App.4th 1130], . . . our review of the text and history of section 190.5[, subdivision] (b) does not lead us to conclude that the statute establishes a presumption in favor of life without parole. The text of the statute appears ambiguous on this point. As noted, section 190.5[, subdivision] (b) says the penalty for special circumstance murder committed by a 16- or 17-year-old offender 'shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life.' It is not unreasonable to read this text, as *Guinn* did, to mean that a court 'shall' impose life without parole unless 'at the discretion of the court' a sentence of 25 years to life appears more appropriate. [Citation.] But it is equally reasonable to read the text to mean that a court may select one of the two penalties in the exercise of its discretion, with no presumption in favor of one or the other. The latter reading accords with common usage. For example, if a teacher informed her students that 'you must take a final exam or, at your discretion, write a term paper,' it would be reasonable for the students to believe they were equally free to pursue either option. The text of section 190.5[, subdivision] (b) does not clearly indicate whether the statute was intended to make life without parole the presumptive sentence." (*Id.* at p. 1371.)

6

We find that *Gutierrez*'s interpretation of section 190.5's syntax is equally applicable to section 1170.126, subdivision (f)'s syntax. We therefore disagree with defendant's interpretation that the "shall/unless" construction used in section 1170.126, subdivision (f) creates a presumption in favor of resentencing. It is true that a court faced with an eligible petition for resentencing is required to resentence the petitioner *unless* it finds doing so would pose an unreasonable risk of danger to public safety. However, the inclusion of the word "shall" and "unless" in the statute in no way means that a trial court's discretion to find that a petitioner would be dangerous to public safety is somehow circumscribed so that it can only find dangerousness in limited, extraordinary circumstances. Rather, we find that the statutory language of section 1170.126 merely reinforces that a trial court is vested with the discretion to *either* resentence a petitioner *or* conclude a petitioner poses an unreasonable risk of danger based on the totality of the circumstances presented in each particular case.

Nonetheless, defendant persists in his claim that section 1170.126 creates a presumption in favor of resentencing. He insists that a hearing on a section 1170.126 petition is essentially the converse of a *Romero*[3] hearing and therefore establishes that a court may only deviate from the newly established "norm" of a second-strike sentence in extraordinary cases when there is proof of current dangerousness.

In *People v. Carmony* (2004) 33 Cal.4th 367, our Supreme Court discussed the legislative purpose behind the three strikes law and the standards sentencing courts should follow in order to determine whether to strike or vacate a prior strike. It noted that "the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify

---

[3] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

7

its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Id*. at p. 378.)

As the Fifth Appellate District explained in *People v. Blakely* (2014) 225 Cal.App.4th 1042 (*Blakely*), "[t]he purpose of the three strikes law has been variously stated as being ' "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses" ' [citation] and 'to promote the state's compelling interest in the protection of public safety and in punishing recidivism' [citation]. Although the [Reform] Act 'diluted' the three strikes law somewhat [citation], '[e]nhancing public safety was a key purpose of the [Reform] Act.' " (*Id*. at p. 1054.)

Since public safety remains the key focus of the Reform Act, we disagree with defendant's assertion that a decision on a section 1170.126 petition must be subjected to the same scrutiny as a *Romero* hearing. A section 1170.126 petition is not the converse of a *Romero* hearing since section 1170.126 does not establish a new sentencing norm.

Additionally, we reject defendant's claim that the trial court should deny an eligible petition for resentencing only in extraordinary cases. This would undermine the intent of the voters in passing the Reform Act—to preserve public safety. The trial court was not required to find that defendant was "outside the spirit" of the Reform Act before it could find that resentencing him would pose an unreasonable risk of danger to public safety.

c. **Abuse of Discretion to Deny Petition**

Next, we address defendant's claim that the trial court erred when it denied his petition.

Whether a defendant poses an unreasonable risk of danger to public safety is a discretionary decision made by the trial court based on the facts presented in the case.

8

However, the facts considered by the trial court must be established by the People by a preponderance of the evidence.

On appeal, we review the court's finding of an unreasonable risk of danger for an abuse of discretion. However, we apply a substantial evidence standard of review to the facts supporting the court's finding. In other words, a factor relied on by the court that is not supported by a preponderance of the evidence cannot form the basis of the court's determination. (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998 [holding that a trial court abuses its discretion when its factual findings are not supported in the record].) With this framework in mind, we do not believe the trial court abused its discretion when it declined to resentence defendant.

When making its dangerousness determination, the court focused on defendant's history of violence, which included the incidents of violence that had occurred while defendant was incarcerated. During the hearing, Danielle Arlanda Harris testified as an expert on criminology and recidivism. Harris stated that a recent study had concluded that inmates who were 55 years of age were considered elderly and recidivism reduces with age. The court, taking Harris' testimony into account, noted that defendant's age may reduce his risk of violence. However, the court was concerned with defendant's history of violent altercations while incarcerated. In 2004, he struck another inmate with a broomstick and was found guilty of battery on an inmate with a weapon. In 2007, he was found guilty of mutual combat. In 2009, he was found guilty of fighting resulting in the use of force. All of these incidents occurred when defendant was already considered elderly according to Harris' testimony, since he was almost 55 years old at the time of the incident in 2004. Yet, the court noted that defendant's age had not eliminated his problem with violence.

Further, the court was concerned with the lack of information regarding the programming defendant participated in while in prison. Earlier, the People had raised

9

concerns with the lack of information regarding defendant's participation in programs to gain insight into substance abuse or anger management, which the court believed were some of the most troubling areas of concern in defendant's case.

"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) The court made its determination that resentencing defendant would pose an unreasonable risk of danger to public safety based on appropriate factors that are supported by substantial evidence. Accordingly, we find that it did not abuse its discretion in coming to this conclusion.

Essentially, defendant argues that the court erred because it did not accord certain factors the weight he believes they deserve, such as the remoteness of his prior crimes, his participation in education classes, and the fact that some of his prior altercations in prison involved self defense. We disagree. Simply because defendant does not agree with the court's conclusion does not mean the court abused its discretion. And, since the court's decision is rationally supported by factual findings that are in turn supported by sufficient evidence, our inquiry must end. Even though there were factors that tended to weigh in favor of resentencing defendant, it was ultimately up to the trial court to determine whether defendant would pose an unreasonable risk of danger to public safety if resentenced. Defendant essentially urges us to reweigh the evidence, which is not our role as the appellate court.

We also disagree with defendant's assertion that the court must take into consideration the fiscal drain on the state's resources that will be incurred due to his continuing incarceration. We fail to see how monetary considerations should factor into a court's determination that resentencing an inmate will pose an unreasonable risk of danger to public safety. Saving money is one of the Reform Act's stated goals.

10

However, the primary purpose of both the three strikes law and Reform Act is to protect public safety. (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1036-1037.) Therefore, the trial court was not required to weigh the potential to reduce costs by releasing inmates like defendant. In essence, the electorate already conducted its own cost-benefit analysis by determining that those inmates whose resentencing would pose an unreasonable risk of danger to public safety should not be released, even if resentencing may provide some savings to the state.

   2.  *Right to a Jury Trial*

Next, defendant argues that due process requires that a determination of dangerousness be made by a jury and be proved beyond a reasonable doubt. He claims the court erred when it implicitly denied his request for a jury trial.

The Second Appellate District addressed this issue in *People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279 (*Kaulick*), which determined that the prosecution must establish dangerousness by preponderance of the evidence, not by proof beyond a reasonable doubt.[4] (*Id.* at pp. 1301-1305.)

We agree with the reasoning set forth in *Kaulick*. The United States Supreme Court has held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.)

In *Kaulick*, the appellate court noted that the maximum sentence that Kaulick was subject to was, and will always be, an indeterminate life term. (*Kaulick*, *supra*, 215 Cal.App.4th at p. 1303.) And, although the Reform Act "presents [Kaulick] with an

---

     [4] The Fifth Appellate District concurred with *Kaulick*'s conclusion in *Blakely*, *supra*, 225 Cal.App.4th 1042.

11

opportunity to be resentenced to a lesser term, unless certain facts are established, he is nonetheless still subject to the third strike sentence based on the facts established at the time he was originally sentenced. As such, a court's discretionary decision to decline to modify the sentence in his favor can be based on any otherwise appropriate factor (i.e., dangerousness), and such factor need not be established by proof beyond a reasonable doubt to a jury." (*Ibid*.)

*Kaulick* relied on *Dillon v. United States* (2010) 560 U.S. 817. In *Dillon*, the court considered whether a two-step sentence modification procedure implicated the Sixth Amendment. (*Id*. at pp. 826-829.) If eligible for a sentence modification, a reduction in the defendant's sentence could be ordered. (*Id*. at pp. 826-827.) *Dillon* concluded that "a defendant's Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt do not apply to limits on downward sentence modifications due to intervening laws." (*Kaulick*, *supra*, 215 Cal.App.4th at p. 1304.) *Kaulick* found *Dillon*'s rationale to be equally applicable to the Reform Act, since "[t]he retrospective part of the [Reform] Act is not constitutionally required, but an act of lenity on the part of the electorate." (*Ibid*.) The resentencing scheme is not plenary; it provides for a proceeding where the original indeterminate life term can be modified downward. *Kaulick* concluded that this did not implicate any Sixth Amendment rights.

We follow *Kaulick* and find that there is no requirement that the dangerousness finding be established beyond a reasonable doubt. Accordingly, we conclude the trial court did not err in denying defendant's motion for a jury trial, because a Sixth Amendment right to a jury trial does not arise in a petition for resentencing under section 1170.126, subdivision (f).

3. *Supplemental Probation Report*

Defendant claims the court should have obtained a supplemental probation report prior to denying his petition for resentencing. Defendant argues that a supplemental

12

probation report was necessary, because the decision to resentence him is functionally the equivalent of a decision to place him on probation. Defendant has forfeited this argument. He did not request a supplemental probation report below, nor did he object to proceeding without one.

Defendant claims his lack of objection does not waive or forfeit his claim, citing to *People v. Dobbins* (2005) 127 Cal.App.4th 176, 178 (*Dobbins*). However, *Dobbins* is inapplicable, because the defendant there remained eligible for probation upon remand. (*Id.* at pp. 181-182.) Therefore, a probation report was mandated by law, unless a written or oral stipulation was entered by the prosecuting and defense attorneys. (§ 1203, subd. (b)(4).) Since the attorneys did not waive or stipulate to proceed without the probation report, the *Dobbins* defendant did not forfeit his claim of error even though he failed to object below. (*Dobbins*, *supra*, at p. 182.)

Unlike *Dobbins*, defendant would not have been eligible for probation as a second-strike offender. (§§ 667, subd. (c)(2), 1170.12, subd. (a)(2); *People v. Johnson* (1999) 70 Cal.App.4th 1429, 1431-1432.) Therefore, a waiver or stipulation to proceed without a probation report was not required below. Accordingly, defendant's failure to request a supplemental probation report or object to its omission forfeits his claim on appeal. (*People v. Murray* (2012) 203 Cal.App.4th 277, 289, fn. 12, overruled on another point in *People v. Gutierrez*, *supra*, 58 Cal.4th 1354; *People v. Johnson*, *supra*, at pp. 1431-1432.)

Regardless, we would reject defendant's contention even if we were to consider it on the merits. The Fifth Appellate District considered and rejected a similar argument in *People v. Franco* (2014) 232 Cal.App.4th 831 (*Franco*), and we agree with the *Franco* court's reasoning.

As we previously discussed, when a defendant is convicted of a felony and is eligible for probation, referral of the matter to the probation officer for an investigation

13

and report is mandatory.  (§ 1203, subd. (b)(1); Cal. Rules of Court, rule 4.411(a).)

However, referral for a report is *discretionary* when a defendant is ineligible for

probation, except when the amount of a restitution fine must be calculated.  (§ 1203,

subd. (g); Cal. Rules of Court, rule 4.411(b).)

Since defendant would not have been eligible for probation even if he was

resentenced as a second strike offender, "neither statute nor rule of court required the trial

court to obtain a supplemental report."  (*Franco*, *supra*, 232 Cal.App.4th at p. 834.)  Like

the *Franco* court, we "decline to impose a mandatory duty on the trial court where the

statutes and rules of court granting authority for probation reports do not so provide."[5]

(*Id*. at p. 835.)

4.  *The Definition of an* "*Unreasonable Risk of Danger to Public Safety*"

Lastly, defendant argues in his supplemental brief that Proposition 47's definition

of an "unreasonable risk of danger to public safety" should be applied to the Reform Act.

a.  **Background**

In November 2012, voters enacted section 1170.126 as part of the Reform Act.

(*People v. Yearwood* (2013) 213 Cal.App.4th 161, 167.)  As discussed above,

section 1170.126, subdivision (f) specifies that a petitioner shall be resentenced unless

"the court, in its discretion, determines that resentencing the petitioner would pose an

unreasonable risk of danger to public safety."  Section 1170.126 does not contain a

definition of the phrase "unreasonable risk of danger to public safety," but does include a

nonexclusive list of criteria a court may consider in making a determination of

dangerousness.  (§ 1170.126, subd. (g).)

Two years later in November 2014, voters enacted Proposition 47, the "Safe

Neighborhoods and Schools Act."  The Legislative Analyst described Proposition 47 as

---

[5] Based on this conclusion, we need not address defendant's claim of prejudice.

14

having three main functions: reducing penalties for certain offenders convicted of nonserious and nonviolent property and drug crimes, allowing certain offenders previously convicted of such crimes to apply for reduced sentences, and requiring state savings resulting from the measure be spent to support various services.[6] (Voter Information Guide, Gen. Elec. (Nov. 4, 2014) analysis of Prop. 47 by Legis. Analyst, p. 35.)

Proposition 47 does not mention the Reform Act. However, it did establish procedures for certain offenders to apply for a reduced sentence. Section 1170.18, subdivision (a) provides that defendants convicted of certain nonserious, nonviolent property and drug felonies can file a petition requesting resentencing. A court that receives the petition shall resentence the petitioner "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.18, subd. (b).)

Pertinent here, section 1170.18, subdivision (c) provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667."

b. **Analysis**

Defendant argues the narrow definition of an unreasonable risk of danger to public safety set forth in section 1170.18, subdivision (c), enacted by Proposition 47, applies to the phrase as used in section 1170.126, enacted by the Reform Act.[7] We disagree.

---

[6] We take judicial notice of the text of Proposition 47 and its accompanying ballot materials. (Evid. Code, §§ 452, 459.)

[7] This issue is currently pending review in the California Supreme Court in *People v. Valencia* (2014) 232 Cal.App.4th 514 (review granted Feb. 18, 2015, S223825).

15

"We recognize the basic principle of statutory and constitutional construction which mandates that courts, in construing a measure, not undertake to rewrite its unambiguous language. [Citation.] That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body." (*People v. Skinner* (1985) 39 Cal.3d 765, 775.) Whether the use of a word is the result of a drafting error "can only be determined by reference to the purpose of the section and the intent of the electorate in adopting it." (*Id.* at p. 776.)

We hold that if we examine the intent of the electorate in passing Proposition 47, we are compelled to conclude that the word "Code" in section 1170.18, subdivision (c) was erroneously used in place of the word "Act," to refer to the Safe Neighborhoods and Schools Act. There is nothing to indicate that in passing Proposition 47 the electorate intended to modify or change the Reform Act in any way.

Defendant disagrees and argues that it is clear from the language of sections 1170.18 and 1170.126 that the electorate intended to modify section 1170.126. Defendant opines that both propositions sought to improve public safety. And, defendant claims that the plain language of Proposition 47 unambiguously applies the definition of an unreasonable risk of danger to public safety to the Reform Act. Furthermore, when Proposition 47 was enacted, the only other instance in the Penal Code where the phrase "unreasonable risk of danger to public safety" was used was in the Reform Act.

We find defendant's arguments unpersuasive. None of the materials accompanying Proposition 47 contain any reference to the Reform Act. For example, the Voter Information Guide to Proposition 47 states that "[t]his measure reduces penalties for certain offenders convicted of nonserious and nonviolent property and drug crimes. The measure also allows certain offenders who have been previously convicted of such crimes to apply for reduced sentences. In addition, the measure requires any state savings

16

that result from the measure be spent to support truancy (unexcused absences) prevention, mental health and substance abuse treatment, and victim services." (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 47 by Legis. Analyst, p. 35.) The Legislative Analyst then detailed the changes that would be made if Proposition 47 was passed. None of these changes included redefining the meaning of the phrase "unreasonable risk of danger to public safety" in the Reform Act.

In fact, there was no mention of reforming the three strikes law in any of the official ballot materials accompanying Proposition 47. Nothing in the official ballot materials reflects that Proposition 47 was intended to have an impact on offenders who did not commit the specified nonserious, nonviolent property or drug crimes described in Proposition 47. The ballot materials indicate that the thrust of the initiative was to reduce these less serious felonies to misdemeanors. Further, the ballot materials emphasize that the resentencing provisions set forth in Proposition 47 were limited to those individuals serving sentences for the specified nonserious, nonviolent drug or property crimes.

The dissent takes the position that we should not confine ourselves to the official ballot materials when ascertaining the voter's intent. In his reply brief, defendant cites to several different Web sites where opponents of Proposition 47 authored written arguments against passing Proposition 47. (See, e.g., The Alliance for a Safer California, *Prop 47 Facts* <http://www.votenoprop47.org/No_On_Prop_47_Facts.html> (as of_____ ).) These arguments contemplate that Proposition 47's definition of an "unreasonable risk of danger to public safety" may alter the definition used in the Reform Act. Unlike defendant and the dissent, we are not convinced that these Web sites, which are beyond the legislative analysis and the official ballot arguments that are distributed to all voters in the state, are indicative of the electorate's intent. Although a court may consider extrinsic aids such as statements to the voters on initiative and referendum measures (*Rich v. State Board of Optometry* (1965) 235 Cal.App.2d 591, 603) when

17

determining intent, it is unclear how widely disseminated these arguments were prior to the election and if the electorate was even aware of these arguments before they voted Proposition 47 into law.[8]

The dissent notes that the official ballot materials are limited by considerations of time and space. We agree that "[b]allot arguments are not legal briefs and are not expected to cite every case the proposition may affect." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 237.) Further, the official summary prepared by the Legislative Analyst need not describe every way the enacted measure may change the law. "The analysis may contain background information, including the effect of the measure on existing law and the effect of enacted legislation which will become effective if the measure is adopted, and shall generally set forth in an impartial manner the information the average voter needs to adequately understand the measure." (Elec. Code, § 9087.)

Here, the ballot summary is completely devoid of any mention of the Reform Act or the three strikes law. We cannot take the dissent's position that the Legislative Analyst likely failed to mention Proposition 47's purported effect on the Reform Act because it believed it was likely to matter less to voters, or that it was an auxiliary issue. If in fact one of the purposes of Proposition 47 was to provide a new definition of an "unreasonable risk of danger to public safety" in the Reform Act—essentially rewriting the standard by which three strikes resentencing petitions are heard and decided by the

---

[8] Further, we note that case law indicates that it may be improper to rely on articles when determining voter intent. (*Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 485.) However, it appears that in the past, our Supreme Court has indeed relied on such articles when ascertaining the electorate's intent. (*California Housing Finance Agency v. Patitucci* (1978) 22 Cal.3d 171, 178.)

18

trial court—that should certainly be "information the average voter needs to adequately understand the measure." (Elec. Code, § 9087.)

Defendant argues that Proposition 47 is merely a continuation of the sentencing reform initiated by the electorate, which includes the reforms initiated by the Reform Act. Further, defendant explains that the drafters and electorate who endorsed Proposition 47 may have reasonably determined that the strict definition of an "unreasonable risk of danger to public safety" was a necessary correction to the Reform Act. He claims the lack of a restrictive definition in the Reform Act led to trial courts resentencing petitions under section 1170.126 too cautiously based on the "natural human tendency to over predict violence and err on the side of further imprisonment."

Defendant's arguments on this point are purely based on conjecture. Despite his claim that Proposition 47 can logically be seen as a way to correct the restrictive use of resentencing employed by the trial courts under the Reform Act, there is actually no evidence that this was conceived or even considered by the electorate. Proposition 47's ballot materials discuss reforming current sentencing laws by reducing certain nonserious, nonviolent felonies to misdemeanors, not by reforming the three strikes law which had already been reformed just a few years earlier.

We are also unconvinced with defendant's claim that the Reform Act and Proposition 47 are in pari materi (on the same subject or relating to the same matter), rendering it so that similar phrases should be given the same meaning. (See *People v. Caudillo* (1978) 21 Cal.3d 562, 585, overruled on another point in *People v. Martinez* (1999) 20 Cal.4th 225, 229, 237, fn. 6 and disapproved of on another ground in *People v. Escobar* (1992) 3 Cal.4th 740, 749-751, fn. 5.) Proposition 47 and the Reform Act had different overarching goals, despite their shared effect of reforming criminal sentencing laws.

19

On the one hand, both the Reform Act and Proposition 47 emphasized public safety and are both targeted at changing the way criminal defendants are sentenced. However, the uncodified section 7 of the Reform Act states that the "act is an exercise of the public power of the people of the State of California for the protection of the health, safety, and welfare of the people of the State of California, and shall be liberally construed to effectuate those purposes." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) text of Prop. 36 proposed law, § 7, p. 110.) Proposition 47, on the other hand, emphasized the potential for fiscal savings if passed. In its findings and declarations, it states: "The people of the State of California find and declare as follows: [¶] The people enact the Safe Neighborhoods and Schools Act to ensure that prison spending is focused on violent and serious offenses, to maximize alternatives for nonserious, nonviolent crime, and to invest the savings generated from this act into prevention and support programs in K-12 schools, victim services, and mental health and drug treatment." (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 47 proposed law, § 2, p. 70.) These two acts are not in pari materi.

Further, defendant's claim that one of the authors of Proposition 47 has seemingly taken the position that Proposition 47's definition of an "unreasonable risk of danger to public safety" extends to the Reform Act is beside the point. The author's intent is irrelevant. "In construing a statute we do not consider the objective of an authoring legislator when there is no reliable indication that the Legislature as a whole was aware of that objective and believed the language of the proposal would accomplish it." (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 726-727.) Here, based on the ballot materials there is no indication the electorate was aware, or even considered the possibility, that Proposition 47 would alter the Reform Act. We cannot infer that the electorate somehow had this intent.

There are also practical reasons for us to conclude that Proposition 47 contains a drafting error. For example, the Reform Act requires that petitions for resentencing be brought within two years of its passage unless the trial court concludes the existence of good cause for filing a late petition. (§ 1170.126, subd. (b).) By the time Proposition 47 took effect, the two-year period for filing a petition under section 1170.126 was nearly over. It is illogical to conclude that Proposition 47 was meant to modify the Reform Act when most of the three strike resentencing petitions were already adjudicated and decided by that time.

The language of section 1170.18 also lends support to our conclusion. Section 1170.18 specifically provides that, "Nothing in this and related sections is intended to diminish or abrogate the finality of judgments in any case not falling within the purview of this act." (§ 1170.18, subd. (n).) Applying the definition of "unreasonable risk of danger to public safety" from section 1170.18 to section 1170.126, would undoubtedly diminish the finality of those three strikes judgments that do not involve a nonserious, nonviolent property or drug crime.

Lastly, our conclusion does not render the phrase "[a]s used throughout this Code" in section 1170.18 meaningless surplusage. The general rule is that "statutes are to be construed to give meaningful effect to all of their provisions, and to avoid rendering any language superfluous." (*Planned Parenthood Affiliates v. Van de Kamp* (1986) 181 Cal.App.3d 245, 270.) Based on the foregoing, we conclude that section 1170.18, subdivision (c) contains a drafting error that must be judicially corrected. Under a corrected reading of the statute, we find that the word "Code" must be read as "Act." Therefore, the phrase would read "[a]s used throughout this Act," meaning Proposition 47.

21

Accordingly, we find no merit in defendant's argument that the order denying his petition must be reversed.[9]

## DISPOSITION

The order denying defendant's petition for recall of sentence is affirmed.

[9] Based on our conclusion that Proposition 47's definition of an "unreasonable risk of danger to public safety" is inapplicable to section 1170.126, we need not address defendant's claim regarding the retroactivity of that definition. That issue is also currently pending review in the California Supreme Court. (*People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted Feb. 18, 2015, S223676.)

_____
Premo, J.

I CONCUR:


_____
Elia, J.

RUSHING, P.J., Dissenting

## I. Introduction

My esteemed colleagues join a number of courts in refusing to apply Penal Code section 1170.18, subdivision (c) (§ 1170.18(c)), according to its plain meaning. To the best of my knowledge, only one of those decisions is currently citable. (*People v. Esparza* (2015) 242 Cal.App.4th 726, 734-737; see Cal. Rules of Court, rules 8.1115(a), 8.1105(e)(1).) Although I joined in that decision, I have concluded on further reflection that I erred in doing so, as I believe my colleagues continue to err here. All of these cases should be governed by the fundamental principle that statutes possessing a plain meaning must be given effect in accordance with that meaning. None of the recognized exceptions to this rule is present. Least of all can the language at issue here be credibly said to involve a "drafting error." The real rationale for refusing to enforce the statute according to its terms is that the effect of the statute's plain meaning was not pointed out in the ballot pamphlet to the voters who adopted it. I have concluded that for a court to disregard plain statutory language on such a ground is obnoxious to the constitutional separation of powers. I have also concluded that, carefully read, the statute contains ample intrinsic evidence that it is intended to accomplish exactly the result my colleagues attribute to a drafting error. In addition, it is apparent that opponents of the measure were aware of this effect and that, while they apparently chose not to refer to it in their argument in the ballot pamphlet, they did urge it in the surrounding public debate as a ground to reject the measure. For those reasons, I would apply the statute as written and would reverse the judgment here so that the trial court can reassess the issues under the legal standard mandated by section 1170.18(c).

## II. The Plain Meaning Rule

In construing a statute adopted by initiative we are bound by the same principles as those governing our construction of statutes enacted by the Legislature. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006; *People v. Elliot* (2005) 37 Cal.4th 453, 478; *Robert*

*L. v. Superior Court* (2003) 30 Cal.4th 894, 900.)  The first and most basic of these principles, often acknowledged by this court, is that " 'if statutory language is "clear and unambiguous there is no need for construction, and courts should not indulge in it." ' " (*Cryolife, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1145, 1154, quoting *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 218 [same]; accord, *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1285; *Coniglio v. Department of Motor Vehicles* (1995) 39 Cal.App.4th 666, 674, quoting *People v. Overstreet* (1986) 42 Cal.3d 891, 895; see *Robert B. v. Susan B.* (2003) 109 Cal.App.4th 1109, 1113 [where language "is clear, we will not engage in statutory construction to determine [its] intended purpose and scope"].)

### III.  The Ambiguous Language Exception

There are of course some well-recognized exceptions to the plain meaning rule. Foremost among them is that where statutory language is ambiguous, courts may consult various constructional aids to determine its intended meaning.  (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103.)  This is not a true exception to the plain meaning rule, but a limitation implicit in the rule itself:  if statutory language is ambiguous, it *has* no plain meaning and a court has no choice but to go beyond the language in hopes of ascertaining its intended meaning and effect.  This limitation cannot come into operation, however, unless the language at issue is "susceptible of more than one reasonable interpretation ."  (*Ibid.*)  "If there is no ambiguity in the language of the statute, then the plain meaning of the language governs."  (*Cypress Semiconductor Corp. v. Superior Court* (2008) 163 Cal.App.4th 575, 581; see *Bonnell v. Medical Bd. of California* (2003) 31 Cal.4th 1255, 1261.)

The majority does not suggest that there is anything ambiguous about the language here under examination.  Section 1170.18(c) declares that the definition of dangerousness set forth there applies "throughout this Code."  This can only refer to the Penal Code.

2

(See *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1255 [finding "nothing ambiguous about the phrase 'as used in this code' " to define " 'emergency' " as used in Public Contract Code]; *People v. Bucchierre* (1943) 57 Cal.App.2d 153, 166 ["The words 'as in this code provided' . . . refer to the Penal Code."].)  Here this means that section 1170.18(c)'s definition of " 'unreasonable risk of danger to public safety' " applies to that phrase as it appears in Penal Code section 1170.126, subdivision (f) (§ 1170.126(f)), and thus to the question whether, as the trial court found, resentencing defendant would pose "an unreasonable risk of danger to public safety."  Since the phrase "throughout this Code," as thus used, is not "susceptible of more than one reasonable interpretation" (*Murphy v. Kenneth Cole Productions, Inc.*, *supra*, 40 Cal.4th at p. 1103), "there is no need for construction and [we] should not indulge in it" (*Cryolife, Inc. v. Superior Court*, *supra*, 110 Cal.App.4th at p. 1154).

## IV.  *The Absurd Consequences Exception*

A narrower exception to the plain meaning rule permits courts to depart from the meaning of statutory language, even if it is unambiguous, when its literal application would produce " ' " 'absurd consequences.' " ' "  (*May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1333; *Younger v. Superior Court* (1978) 21 Cal.3d 102, 113; see *California Highway Patrol v. Superior Court* (2008) 158 Cal.App.4th 726, 736 ["The literal meaning of unambiguous statutory language 'may be disregarded to avoid absurd results"].)  The underlying rationale is that the Legislature *cannot have intended* to bring about absurd consequences, so if the statute has that effect, it must be an incorrect expression of legislative intent.  (See *Sterling Park, L.P. v. City of Palo Alto* (2013) 57 Cal.4th 1193, 1203 [proposed interpretation "would lead to absurd results the Legislature cannot have intended"]; *Fireman's Fund Ins. Co. v. Superior Court* (2011) 196 Cal.App.4th 1263, 1281, fn. omitted ["We cannot conclude that our Legislature intended such absurd results."]; *Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 586 ["Because the

3

language of section 1122 unambiguously requires express waiver, judicial construction is not permitted unless the statutes cannot be applied according to their terms or doing so would lead to absurd results, thereby violating the presumed intent of the Legislature."].)

I see nothing even remotely "absurd" about giving effect to the definition in section 1170.18(c) according to its plain meaning. On the contrary, by adopting a narrowed definition of "unreasonable risk of danger to public safety," the voters impliedly found that courts had interpreted that phrase too broadly in denying relief under Proposition 36. Given that implied finding, there was nothing unreasonable, let alone absurd, in extending the benefits of the narrowed definition to defendants whose Proposition 36 applications remained unresolved.

## V. *The Contrary-to-Manifest-Intent Exception*

A somewhat more nebulous rule permits departures from a statute's literal language " 'to give effect to *manifest purposes* that, *in the light of the statute's legislative history*, *appear from its provisions* considered as a whole.' " (*California Highway Patrol v. Superior Court*, *supra*, 158 Cal.App.4th at p. 736, italics added.) Under this exception the question is whether "follow[ing] the plain meaning of a statute . . . would '*frustrate*[] the manifest purposes of the legislation as a whole . . . .'" (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340, italics added, quoting *People v. Belleci* (1979) 24 Cal.3d 879, 884.) Here no conflict between the literal meaning and manifest purpose of section 1170.18(c) appears. The statute can be applied to cases arising under Proposition 36 without impinging in any way upon the purposes or effects of Proposition 47. Indeed, as noted above, extending the benefits of the new definition to persons in defendant's position is fully consistent with the curative purpose readily inferred from its adoption.

The majority points to no evidence of a "manifest purpose" that would be frustrated or impaired by literal application. It does not attempt to demonstrate that the

4

will of the electorate would be *thwarted*, or the purpose of Proposition 47 *frustrated*, by applying section 1170.18(c) according to its terms.  Instead the majority's treatment rests on the premise that the will of the electorate is not adequately *corroborated* by *extrinsic evidence* of legislative intent, which in the majority's treatment consists entirely of the ballot pamphlet.  But in the absence of some *conflict* between the statute's literal meaning and the *affirmatively manifested* intentions of the electorate, there is no occasion to look for corroboration of the voters' intent.  Any inquiry under the "manifest intention" rubric should begin and end with the *absence* of evidence that voters intended the new definition *not* to benefit persons in defendant's position.

Unless applied with assiduous judicial restraint, the manifest intention rule becomes a serious threat to the separation of powers.  In implicit recognition of this fact, we have stated that "courts should disregard unambiguous language 'only in "*extreme cases*"—those in which, *as a matter of law, the Legislature did not intend the statute to have its literal effect.*"  (*California Highway Patrol v. Superior Court*, *supra*, 158 Cal.App.4th at p. 739, italics added, quoting *Gorham Co., Inc. v. First Financial Ins. Co.* (2006) 139 Cal.App.4th 1532, 1544.)  Here there is no manifestation of intent by the voters that section 1170.18(c) should *not* "have its literal effect"—let alone grounds to find such an intent "as a matter of law," meaning one on which reasonable minds cannot differ.  At the same time, there *is* affirmative evidence—in the plain language voters adopted—that they *did* intend section 1170.18(c) to govern cases such as defendant's.  Nor can this case seriously be characterized, under any fair assessment of the relevant factors, as involving an "extreme" divergence between literal and inferred legislative intentions.  Even if credited, the majority's argument cannot make the case more than

5

doubtful and debatable.  Under such conditions, the words of the enactment must control.[1]

## VI.  *"Drafting Error"*

### A  *No Error by Drafters*

The majority makes no explicit attempt to bring this case within any of the foregoing exceptions to the plain meaning rule.  Instead it invokes what may be the rarest and narrowest of such exceptions, under which courts may correct a "drafting error" in statutory language.  The majority concludes, in other words, that when the drafters of Proposition 47 wrote "throughout this Code," they actually meant "in this act." On the face of the statute this premise seems extremely unlikely.  Two subparagraphs before the provision at issue, the drafters had pointedly adopted the phrase "this act" as an abbreviation for later use.  Section 1170.18, subdivision (a), refers to persons "who would have been guilty of a misdemeanor under *the act that added this section ('this act')*."  (§ 1170.18, subd. (a).)  It is difficult to believe that drafters would then almost immediately use "this Code" in place of the abbreviation they had just adopted.

In contrast to some initiative measures, Proposition 47 appears to have been authored by persons of no small legal ability.  One of the official proponents was George Gascón, the San Francisco District Attorney.  (George Gascón, Letter to Office of the

---

[1] This was the Supreme Court's conclusion in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 726-727, overruled on another point in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854, footnote 19, which the majority cites for its recital of the rule that the views of a bill's author, if not communicated to other legislators, are not evidence of legislative intent.  The case is more germane for its ultimate holding that the author's statements there were *irrelevant* because the language at issue furnished no occasion to consult extrinsic evidence of intent.  (*Id.* at p. 727 ["even assuming other legislators were aware of the author's press release, [the author's asserted intent] cannot be reconciled with the plain meaning of the statutory language"].)

6

Attorney General, Dec. 14, 2013[2]; Ballot Pamp., General Elec. (Nov. 4, 2014), argument in favor of Prop. 47, p. 38.)  It also appears that the Stanford Justice Advocacy Project (SJAP)—an officially recognized student organization at Stanford Law School—contributed to the drafting of the measure.  (Ho, Prop. 47:  Deep split over law reducing 6 felonies to misdemeanors—S.F. Gate (Nov. 5, 2015) [stating that, according to Gascón, SJAP "helped draft Prop. 47"][3]; Romano, et al., Proposition 47 Progress Report: Year One Implementation (Oct. 2015), p. 1 [according to its Director, SJAP "was involved in the drafting of Proposition 47 . . . ."][4]; Organizations Archive – Stanford Law School, <https://law.stanford.edu/organizations/?first_letter=J&page=1> (as of [guide to student organizations on school website].)  Another article identifies Lenore Anderson, executive director of Californians for Safety and Justice, as an author.  (Chang, et al., Unintended consequences of Prop. 47 pose challenge for criminal justice system, L.A. Times (Nov. 6, 2015).)[5]  According to that organization's website, she was formerly "Chief of Policy and Chief of the Alternative Programs Division at the San Francisco District Attorney's Office, where she spearheaded initiatives to reduce recidivism and improve public safety.  She also *crafted local and state legislation* to aid victims of domestic violence, protect violent crime witnesses, reduce elementary school truancy and reduce recidivism among

---

[2]  Available on the Attorney General's website <https://oag.ca.gov/system/files/initiatives/pdfs/13-0060%20%2813-0060%20%28Neighborhood%20and%20School%20Funding%29%29.pdf?> (as of Mar. 11, 2016).

[3]  Available at <http://www.sfgate.com/crime/article/S-F-district-attorney-defends-Prop-47-which-6614091.php> (as of Mar. 11, 2016).

[4]  Available at <https://www-cdn.law.stanford.edu/wp-content/uploads/2015/10/Prop-47-report.pdf> (as of Mar. 11, 2016).

[5]  Available at <http://www.latimes.com/local/crime/la-me-prop47-anniversary-20151106-story.html> (as of Mar. 11, 2016).

people convicted of nonviolent crimes." (Californians for Safety and Justice, Our Staff, <http://www.safeandjust.org/About-Us/ourteam> (as of Mar. 11, 2016) italics added.)

I cannot subscribe to the notion that the San Francisco District Attorney, a former deputy district attorney experienced in drafting legislation, and a collective of Stanford law students wrote "throughout this Code" when they meant to write "in this act." There are many ways the drafters could have expressed the meaning imputed to them by the majority, and "throughout this Code" is patently not one of them. Any member of the bar—and any student capable of gaining admission to Stanford Law School—would immediately recognize that "throughout this Code" means something quite different from "in this act." I have no doubt that when the drafters wrote "throughout this Code," that was exactly what they meant. And since section 1170.126(f) is the only other place in the Penal Code where the defined phrase appears, they must have understood and intended this language to extend Proposition 47's definition of dangerousness to petitions filed under Proposition 36.

Indeed, it appears that almost simultaneously with the adoption of the later measure, one of its drafters was publicly recorded as expecting the newly adopted definition to apply to Proposition 36 applicants. As reported in a Los Angeles Times article published the day after the election, the Director of SJAP stated that Proposition 36 petitioners could "return to court and cite Proposition 47's new definition of an 'unreasonable risk of danger,' which Tuesday's ballot measure defined as likely to commit serious or violent crimes that include homicide, sexual assault and child molestation." (<http://www.latimes.com/local/politics/la-me-ff-pol-proposition47-20141106-story.html> (as of Mar. 11, 2016).)

The majority describes defendant's assertion of this fact as a "claim," though it was reported by a highly reputable newspaper and accepted as fact in one of the now-uncitable decisions whose analysis the majority otherwise embraces. The majority then

8

declares the assertion "irrelevant" because " '[i]n construing a statute we do not consider the objective of an authoring legislator when there is no reliable indication that the Legislature as a whole was aware of that objective and believed the language of the proposal would accomplish it.' " (Lead opn. at p. 20, quoting *Calvillo-Silva v. Home Grocery, supra,* 19 Cal.4th 714, 726-727.) This may be conceded as a general matter where enactments of the Legislature are concerned; but there is ample authority to contrary effect with respect to voter-adopted measures. (See *Carman v. Alvord* (1982) 31 Cal.3d 318, 331, fn. 10 [while not dispositive of the meaning of an initiative amendment, "an after-the-fact declaration of intent by a drafter. . . may deserve some consideration"]; *Stanton v. Panish* (1980) 28 Cal.3d 107, 114 [drafter's declaration "may be considered in the absence of evidence that the electorate may have had reason to understand the provision differently"].)

Here in particular, where the plain meaning of the measure is dismissed as the product of a "drafting error," I find it *highly* relevant that an author of the statute flatly contradicted the claim—and did so at a time when, apparently, no dispute had yet arisen on the subject. After all, a mistake by the legislation's *author* (or a "scrivener," i.e., a transcriber of the author's intent) is precisely what a claim of "drafting error" posits. A statement by an author that the statute says exactly what he or she meant it to say, and has the effect he or she meant it to have, should utterly dispel any claim of a "drafting error" subject to judicial correction.

## B. *Narrowness of Exception*

The judicial power to correct legislative drafting errors is to be employed only with "great restraint." (*Bonner v. County of San Diego* (2006) 139 Cal.App.4th 1336, 1346, fn. 9; *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 905 (conc. opn. of Werdegar, J.).) This restraint serves a critical constitutional function, because any judicial refusal to apply a statute according to its terms threatens to impinge

9

upon the coequal power of the legislative branch.**⁶** The exercise of such a power threatens both to weaken the people's representatives—or in this context, the people themselves—and to relieve them of the responsibility to act with diligence and circumspection in choosing and adopting statutory language. To avoid such effects, courts can and should disregard statutory language under the rubric of a "drafting error" only where it is clear that the statute was *inartfully drawn* so as to *affirmatively misstate* the otherwise plainly established intent of lawmakers. (See *Gray Cary Ware & Freidenrich v. Vigilant Ins. Co.* (2004) 114 Cal.App.4th 1185, 1193-1194, italics added ["The separation of powers doctrine prevents us from rewriting statutes that do not conflict with the Constitution, other than to correct an *obvious and minor drafting error* where necessary to effectuate the intent of the Legislature."].)

It happens that Proposition 47 does contain an "obvious and minor drafting error"—an omitted "as"—that would warrant judicial correction in a proper case.**⁷** The error is obvious in the sense not that it is *conspicuous* but that, *once noticed*, it cannot be attributed to anything but inadvertence. This is precisely the sort of mistake that courts have remedied under the rubric of a drafting error. Thus in *Szold v. Medical Bd. of California* (2005) 127 Cal.App.4th 591 (*Szold*), the word "or" had been replaced by "of"

---

**⁶** When voters adopt an initiative measure they are exercising legislative power. (Cal. Const., art. IV, § 1.)

**⁷** Section 1170.18, subdivision (b), provides that resentencing is to take place "pursuant to Sections 11350, 11357, or 11377 of the Health and Safety Code, or Section 459.5, 473, 476a, 490.2, 496, or 666 of the Penal Code, *those sections have been amended or added by this act.*" The absence of an "as" immediately preceding the italicized language turns that language into an independent clause, resulting in a run-on sentence, i.e., two independent clauses joined by a comma splice. This violates basic rules of punctuation. It also renders the italicized phrase superfluous. It is, in other words, a genuine "drafting error," illustrating the fact that no one can achieve absolute perfection in drafting legal language, even when their work is proofread by the Legislative Counsel, as every ballot measure is required to be. (Elec. Code, § 9091.)

10

as a bill progressed through the Legislature. Although this changed the meaning of the statute in an important respect, the bill continued to be described in legislative materials as possessing its original meaning and effect. From these clear proofs the court could safely conclude that "the Legislature intended to specifically require" what the adopted language failed to require, "and that the insertion of the word 'of' for 'or' was an inadvertent drafting error" which should not be given effect. (*Id.* at p. 598.) In contrast, no slip of the fingers can cause one to type "this Code" when one means to type "this Act."

Nor does Proposition 47's use of "throughout this Code" bear any resemblance to the drafting errors that courts have corrected in other cases. The *Szold* court cited *People v. Superior Court (Blanquel)* (2000) 85 Cal.App.4th 768, 771, where circumstances furnished an objective basis to infer the accidental omission of cross-references to certain predecessor statutes in the course of a complex reorganization of a portion of the code. Similarly, in *People v. Alexander* (1986) 178 Cal.App.3d 1250, 1265, this court rejected a contention that the Legislature had impliedly pardoned the defendant for his sale of PCP when, "in the 'hurry and confusion' of major legislative activity involving changes in over 100 statutes, the Legislature, through an inadvertent drafting error, eliminated for a period of 29 days the sanctions against selling PCP." Here of course there was no similar hurry or confusion that might reasonably lead to details being overlooked. The drafters were required to prepare only one measure consisting of 18 sections. They had all the time they wanted or needed to ensure that it expressed their intentions. The voters, for their part, had access to the measure's language for months before they were called upon to cast their ballots.[8]

_____

[8] See Elections Code sections 9002, subdivision (a) [requiring Attorney General to post proposed initiative on website and solicit public comments prior to circulation]; 9006, subdivision (b) [requiring Attorney General to prepare circulating title and (continued)

11

Another illustration of a legislative drafting error is provided by this court's decision in *In re Chavez* (2004) 114 Cal.App.4th 989, 998 (*Chavez*). The question there was whether a change in the sentence for tax fraud was intended to apply retroactively so as to abate the defendant's sentence under prior law. We concluded that the purpose of the change was to correct an anomaly introduced by an earlier amendment, which had been in effect when the defendant was sentenced. That amendment had been part of "voluminous" 1983 legislation that was largely concerned with public education and its funding, but that also included provisions conforming state tax law to certain changes in federal law. (*Id.* at p. 994.) One of the conforming changes echoed the federal tax fraud statute, with the result that the California statute now imposed an indeterminate sentence despite this state's broad abandonment of indeterminate sentencing six years earlier. (*Id.* at p. 995.) The bill correcting this anomaly was described in its legislative history as a "cleanup bill" needed " 'to correct technical and grammatical errors in penal provisions in various codes.' " (*Id.* at p. 995.) The attorney general argued to us that the earlier adoption of an indeterminate term had been a deliberate effort to increase deterrence, but we found it "far more likely that SB 813's incongruous and unexplained reversion to indeterminate sentencing was the result of the drafters' attempt to track the federal language as closely as possible." (*Id.* at p. 997.) We thus concluded that, "[g]iven the legislative history and the surrounding circumstances . . . the 1983 amendment was a drafting error and was not enacted for any deterrent purpose." (*Id.* at p. 998.) We noted

summary within 10 days after receipt]; 9014, subdivision (a) [contemplating that circulation of petition may commence on official summary date]; 9033, subdivision (b)(1) [effectively requiring at least 131 days between date measure is certified for ballot and date of election in which it is to be voted upon]; 9034, subdivision (b) [requiring Legislature to conduct hearings on measure at least 131 days before election]; 9094, subdivision (a) [requiring that ballot pamphlet be sent to voters at least 21 days before election]; 9092 [requiring Secretary of State to make contents of pamphlet available to public at least 20 days before pamphlet sent to printer].)

12

that a " 'dangerous potential for drafting errors' " had been created by the extreme complexity of the 1983 bill and the fact that it had been focused on educational reforms rather than criminal law. (*Ibid.*, quoting *People v. Alexander*, *supra*, 178 Cal.App.3d 1250, 1262.) Because the later amendment was intended to " 'fix a mistake,' " we inferred an intent that it be applied retroactively. (*Id.* at p. 998, quoting *In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 172.)

None of these factors were present here. There was no necessity, and no apparent attempt, to track laws promulgated by another sovereign. There was no "extreme complexity." Proposition 47 was not focused on some tangentially related subject; both it and Proposition 36 sought to bring about the release of nondangerous prisoners in order to free resources for other purposes. The one similarity between this case and *Chavez* is that section 1170.18(c) was indeed intended to "fix a mistake" in a sense, and for that reason should be applied retroactively. But its use of the phrase "throughout this Code" bears no resemblance to the drafting error found in *Chavez* or in any of the other cases I have examined.

More nearly resembling this case is this court's decision in *In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1436, where we rejected an argument by a child welfare agency that a statutory provision governing dependency dispositions "must have been inadvertent" because it would produce consequences the Legislature could not have intended. We noted that the language at issue had been adopted to correct "what was unquestionably a drafting error," i.e., a transposed "or" in the phrase, " 'paragraph (1), (3), or of subdivision (b).' " (*Id.* at p. 1437, quoting Stats.2003, ch. 813, § 7, p. 4749.) The Legislature's attention to the language on that occasion militated against the hypothesis that the amending language was itself the product of inadvertence.

Similarly, in *People v. Garcia* (1999) 21 Cal.4th 1, 4, 6, the Supreme Court refused to base its construction of a provision of the "Three Strikes" law on a posited

13

" 'drafting oversight' " or " 'drafting error' " as manifested in a supposed discrepancy between two otherwise redundant provisions of the Three Strikes law.  The court found such an approach untenable because it would "require the court to disregard one of the two assertedly conflicting paragraphs or to rewrite some of their provisions.  Although we may properly decide upon such a construction or reformation when *compelled by necessity* and supported by *firm evidence of the drafters' true intent* (see, e.g., *People v. Skinner* (1985) 39 Cal.3d 765, 775, 217 Cal.Rptr. 685, 704 P.2d 752), we should not do so when the statute is *reasonably susceptible to an interpretation that harmonizes all its parts without disregarding or altering any of them*."  (*Id.* at p. 6, italics added.)

Here no "necessity" compels us to disregard the plain meaning and effect of "throughout this Code."  Nor is there any "firm evidence," or any evidence, that this language contravenes, subverts, frustrates, impairs, conflicts with, or departs from the "drafters' true intent."  On the contrary, the *only* reliable evidence of that intent is the statutory language itself.  The cases concluding otherwise have declined to adhere to the voters' plainly expressed intent not because it is repugnant to anything in the statutory language or history, but because it is not *corroborated* by some *additional* evidence assuring us that the voters really meant what they quite clearly said.  Such an approach cannot be validated by invoking the concept of a "drafting error."

## C. *Intrinsic Confirmation of Literal Meaning*

If I thought there were sufficient reason to look behind the plain meaning of section 1170.18(c), I would begin with a careful examination of the text of that and related provisions.  This is appropriate because " '[i]n interpreting a voter initiative . . . , "we turn first to the language of the [initiative], giving the words their ordinary meaning." [Citation.]  The [initiative's] language must also be construed in the context of the statute as a whole and the [initiative's] overall . . . scheme." (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037, quoting

14

*People v. Rizo* (2000) 22 Cal.4th 681, 685, bracketed material in original; see *People v. Arias* (2008) 45 Cal.4th 169, 177 ["If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, '[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes.' "].)  Such an examination reveals considerable textual evidence that the drafters of Proposition 47 *did* positively intend to extend Proposition 47's dangerousness standard to Proposition 36 petitions.

First, as pointed out above, shortly before using the phrase "this Code" to describe the reach of the definition in section 1170.18(c), the drafters had deliberately adopted the phrase " 'this act' " as shorthand for Proposition 47.  (§ 1170.18, subd. (a).)  They proceeded to employ this shorthand phrase no fewer than seven times in section 1170.18, including in subdivision (b), which contains the phrase defined in the next subdivision "[a]s used throughout this Code."  (§ 1170.18(c).)  It strains credulity to suppose that they slipped into using a gross misnomer when they really meant to use "this act" for an eighth time.

The majority's construction of section 1170.18(c) is also at odds with the use of the term "throughout" in the phrase "as used throughout this Code."  It is not enough to simply substitute "act" for "Code," because in the majority's reading the definition does not apply "throughout" anything, even the act.  The defined phrase appears only in one place:  Penal Code section 1170.18, subdivision (b).  If the intent was only to define that phrase as used in that subdivision, it would have been more felicitously expressed by saying "as used in this section" or at most, "in this act."  "Throughout," in other words, implies that the defined phrase appears in more than one place.  In fact, the phrase appears in two—Penal Code section 1170.18, subdivision (b), and section 1170.126(f).

15

"Throughout" is consistent with an intent to refer to both of them. It is not consistent with an intent to refer to only one.

The text of Penal Code section 1170.18 reinforces the plain meaning of subdivision (c) for a subtler, but I think even more compelling, reason: in the absence of an intent to benefit Proposition 36 petitioners, there was no reason to write Penal Code section 1170.18 the way it is written; it could have been drawn in a significantly simpler and more straightforward manner. Recall that Proposition 36 requires resentencing unless the court determines that resentencing would pose "an unreasonable risk of danger to public safety." (§ 1170.126(f).) The drafters of Proposition 47 copied the quoted phrase into Penal Code section 1170.18, subdivision (b), although it was already in use and its meaning and effect had been extensively litigated under Proposition 36. Had the drafters simply borrowed that phrase, it would suggest that they expected and intended courts to possess the same broad discretion under Proposition 47 they had been held to have under Proposition 36. Instead, the drafters *redefined* the borrowed phrase to mean something new: "an unreasonable risk that the petitioner will *commit a new violent felony* within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18(c).) This had the effect of sharply restricting the latitude courts had been allowed, or found themselves to be allowed, under Proposition 36. But if the intent was to restrict judicial discretion only for purposes of Proposition 47, *there was no reason to introduce the earlier phrase from Proposition 36*. Penal Code section 1170.18, subdivision (b) could simply have been drafted to say that resentencing would be required unless the court found an unreasonable risk that the petitioner would "commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18(c).) The drafters could, in short, have stricken the phrase they borrowed from Proposition 36 and incorporated the new test directly into section subdivision (b), eliminating any need

16

for subdivision (c).  This would not only shorten and simplify Proposition 47; it would obviate any risk that Proposition 36 petitioners would attempt to take advantage of the new test.  That the drafters instead lifted a phrase from Proposition 36, and then redefined it in a substantially narrower way, can only be explained as intended alter the rule of decision in Proposition 36 petitions so as to constrain the broad discretion courts had been exercising to deny relief under that measure.

Another very familiar rule of statutory construction—repeatedly acknowledged by us—is that " '[w]e must . . . 'if possible, . . . give effect and significance to every word and phrase of a statute.' [Citation.]  When two provisions touch upon a common subject, 'we must construe them "in reference to each other, so as to 'harmonize the two in such a way that no part of either becomes surplusage.' " ' [Citations.]  'We must presume that the Legislature intended "every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function." ' [Citations.]" (*Meyers v. Retirement Fund of Fed. City Employees* (2014) 223 Cal.App.4th 1201, 1206; *Nativi v. Deutsche Bank National Trust Company* (2014) 223 Cal.App.4th 261, 283-284 [" 'The rules of statutory construction direct us to avoid, if possible, interpretations that render a part of a statute surplusage.' [Citations.]  [Citation.]  Courts 'must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous.' [Citations.]  [Citation.]  The well-established principles of statutory construction 'preclude judicial construction that renders part of the statute "meaningless or inoperative.'."]; *People v. Scott* (2012) 203 Cal.App.4th 1303, 1313 ["We also attempt to give effect to every word in a statute and avoid constructions that render statutory terms superfluous or meaningless."]; *Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1296 ["A construction making some words surplusage is to be avoided."]; *Toshiba America Electronic Components, Inc. v. Superior Court* (2004) 124 Cal.App.4th 762, 769 [same]; *People v. Superior Court* (2003) 114 Cal.App.4th 102, 104

17

[" 'Where reasonably possible, we avoid statutory constructions that render particular provisions superfluous or unnecessary.' "].)

The majority's treatment renders superfluous Proposition 47's use of the phrase "unreasonable risk of danger to public safety." Under the majority's view, that phrase has no effect in Proposition 47 other than to complicate and lengthen the statute. Under a correct view, as I see it, that phrase can readily be understood, in support rather than derogation of the measure's plain meaning, to serve the *very purpose* of correcting the courts' unduly parsimonious approach to petitions under Proposition 36.

## VII. Voter Appreciation of Consequences

## A. Unsound Legal Premise

If the majority's treatment has any basis in historic fact, it must be not that the *drafters* used words they didn't mean, but that the *voters* were *insufficiently aware* of the *legal effect* of those words, and thus did not appreciate the consequences of their vote. I question the factual assumption on which this reasoning rests, but more fundamentally I do not believe it states an adequate reason to disregard plain statutory language.[9] The majority acknowledged as much in *In re Gabriel G.*, *supra*, 134 Cal.App.4th 1428, 1436, where the plain meaning of a statute was challenged on the ground that it produced unintended consequences: "[W]e must recall that in construing a statute, 'that which is

---

[9] If courts were empowered to abrogate statutes based upon doubts that lawmakers appreciated their effects, government would grind to a halt. It is fanciful to suppose that legislators, or a sizable proportion of them, are aware of all of the consequences, or even contents, of the bills they enact. One online article compares a 1,018-page health care reform bill to earlier federal legislation: "[M]ajor spending bills frequently run more than 1,000 [pages]. This year's stimulus bill was 1,100 pages. The climate bill that the House passed in June was 1,200 pages. . . . Budget bills can run even longer: In 2007, President Bush's ran to 1,482 pages." (Is 1,000 pages long for a piece of legislation? <http://www.slate.com/articles/news_and_politics/explainer/2009/08/paper_weight.html> (as of Mar. 11, 2016.)

construed is the statutory text.' [Citation.] *Evidence of legislative inadvertence would have to be quite compelling before we would ignore the plain language of the law.* [Citation.] The only evidence of inadvertence the Department offers is its assessment of the unintended consequences the change will have. *Legislation often has unintended consequences. But we cannot construe the amendment in a manner wholly unsupported by its text merely to avoid the purported unintended consequences.* [Citation.]" (*Id.* at pp. 1436-1437, italics added.)

Again I must observe that a due regard for the separation of powers requires that when the legislative will is expressed in clear language which does not frustrate other manifestations of legislative intent and does not produce absurd results, lawmakers must be *deemed* to have intended the effect of their enactments, whether or not we find it likely that they actually did so. The tacit premise of the majority's treatment is that where an effect may have been inobvious to voters, the absence of extrinsic corroboration of their intent is by itself sufficient ground for courts to deny the enactment that effect, no matter how inexorably it may flow from the words they have adopted. That premise turns the "manifest purpose" exception on its head by authorizing courts to disregard clear statutory language unless it is affirmatively ratified by other evidence of legislative intent. This reverses the proper burden of proof, which should rest on those who seek to deny effect to plain language—not those who seek to enforce an enactment according to its terms. I know of no precedent for such an approach. (Cf. *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246, italics added ["[T]he ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the *probable meaning of uncertain language*."].) In my view, any inquiry into the voters' intent is precluded by the facts that (1) the language is clear and (2) nothing in the measure or its

19

history suggests, let alone "manifests," an intention by the electorate *not* to bring about the effects flowing from that language.

## B. *Evidence That Consequences Were Acknowledged*

If I thought an inquiry into voter intentions were supportable, I would still take exception to confining it, as the majority does, to the contents of the ballot pamphlet. The majority understates the extent to which the effect of section 1170.18(c) on Proposition 36 petitions was acknowledged—invariably by opponents of the measure—prior to the election.[10]  After minimizing the extent and tenor of these materials, the

_____

[10]  Defendant has requested judicial notice of printouts of several of these webpages, but the pages as well as the sources from which they are drawn may still be found either at their original web addresses or as archived elsewhere on the web.  (See Facts – No on Prop 47 <http://www.votenoprop47.org/No_On_Prop_47__Facts.html> (as of Mar. 11, 2016); Californians Against Prop. 47 | About Proposition 47, <https://web.archive.org/web/20141010054701/http://californiansagainst47.com/about-proposition-47/> (as of Mar. 11, 2016 [recapitulating criticism by California District Attorneys' Association (CDAA)]; Proposition47_A_Cruel_Fraud.pdf: <http://www.co.mendocino.ca.us/da/pdf/Proposition47_A_Cruel_Fraud.pdf> (as of Mar. 11, 2016 [apparent copy of CDAA report]; D. Greenwald, Analysis:  Perspectives on Proposition 47 (Oct. 29, 2014) Davis People's Vanguard <http://www.davisvanguard.org/2014/10/analysis-perspectives-on-proposition-47/> (as of Mar. 11, 2016 [quoting Judge J. Richard Couzens of the Placer County Superior Court]; Couzens, Prop. 47: a perspective from the bench (Oct. 28, 2014) Davis Enterprise <http://www.davisenterprise.com/forum/opinion-columns/prop-47-a-perspective-from-the-bench/> (as of Mar. 11, 2016) [apparent source of preceding]; Our Readers Say: Police, sheriffs say no to Prop 47 <http://www.redlandsdailyfacts.com/opinion/20141024/our-readers-say-police-sheriffs-say-no-to-prop-47> (as of Mar. 11, 2016) [letter from sheriffs and police chiefs:  "Prop 47 would rewrite California law, including the Three Strikes Reform law, to give the term "unreasonable risk of danger to public safety" a very narrow definition."].)

Another, more visually striking page from the Californians Against 47 site also acknowledges the effect Proposition 47 would have on Proposition 36 cases. (Californians against Prop.47 | No on Proposition 47 <http://wayback.archive-it.org/5903/20141031201441/http://californiansagainst47.com/> (as of Mar. 22, 2016.).)

(continued)

20

majority suggests that we can assign no significance to them because it is "unclear how widely disseminated these arguments were prior to the election and if the electorate was even aware of these arguments before they voted Proposition 47 into law." (Lead opn. at p. 18, fn. 8.) But this, again, reverses the burden of proof. The burden is not on the proponent of a measure's plain meaning to adduce extrinsic evidence proving that voters were made subjectively aware of a contested effect. The burden is on those who would disregard the plain meaning to adduce affirmative evidence that the effects flowing from the measure's language are *contrary* to the will of those who adopted it. Evidence that the true meaning and effect of the statute were acknowledged in public debate is relevant to refute claims of voter ignorance, though it is by no means necessary. In any event it cannot be ignored due to mere doubts about "how widely disseminated these arguments were." Where the plain meaning of an enactment is challenged on the ground that voters did *not* understand its legal effect, it seems to me that *any* evidence of public awareness has a logical tendency to rebut the factual premise on which the challenge rests.

---

At least one of the above pieces also appeared in a daily newspaper. (See <http://www.davisenterprise.com/print/?edition=2014-10-28&ptitle=A6> (as of Mar. 11, 2016 [web facsimile of print page containing Couzens piece].) The Redland Daily News piece, or a version of it, also appeared on the website of the Highland Community News, and may therefore have appeared in that entity's newspaper as well. (San Bernardino County Police Chiefs and Sheriff's Association says: No on Prop 47 – Highland Community News: Opinion <http://www.highlandnews.net/opinion/san-bernardino-county-police-chiefs-and-sheriff-s-association-says/article_1d3fb9f8-5bc3-11e4-8c0f-47ac194ced49.html> (as of Mar. 11, 2016.).)

The foregoing are only the *web-accessible sources* thus far found which refer to the effect of section 1170.18(c) on Proposition 36 cases. Without vastly greater resources—and perhaps even with them—it is impossible to know what information may have been presented to voters through more traditional media such as broadcast advertising, flyers, and campaign mailers.

21

Evidence that a challenged effect was acknowledged and debated in the public arena also flatly refutes any suggestion that the effect was so subtle as to go entirely unnoticed. Implicit in some of the not-to-be cited decisions is the suggestion that the drafters had essentially *duped* voters by slipping a redefinition of dangerousness into Proposition 47 without highlighting its effect on Proposition 36 petitions. Again, I do not think such a premise affords any occasion for judicial abrogation of plain statutory language. If it does, we may anticipate that the opponents of numerous past ballot measures—including some of far greater moment than Propositions 36 and 47—will soon be filing new challenges to their more obscure provisions. Perhaps there could arise an extreme case where a challenged effect was so obscure, unheralded, and momentous as to make a truly compelling case for judicial intervention. But surely this is not such a case. As the above materials demonstrate, the meaning and effect of "throughout this Code" were neither obscure nor unheralded. All the majority can say is that they were not specifically mentioned in the ballot pamphlet. That is not nearly enough, in my view, to justify judicial abrogation of plain statutory language.

Confining the inquiry into voter intent to the four corners of the ballot pamphlet is particularly objectionable because the contents of that document are constrained by considerations of space, time, and comprehensibility, requiring countless judgments by the contributors to the pamphlet as to what effects of a measure are sufficiently *material* to warrant discussion. The official summary of any ballot measure is authored by the office of the Legislative Analyst. (Elec. Code, §§ 9087, 9086, subd. (b).) The summary is required only to "generally set forth in an impartial manner the *information the average voter needs to adequately understand the measure*." (Elec. Code, § 9086, subd. (b), italics added.) The preparer of such a summary must be given considerable latitude in determining what to include. (See *Brennan v. Board of Supervisors* (1981) 125 Cal.App.3d 87, 96 ["Faced with the difficult task of simplifying a complex proposal, the

22

Committee drafted a summary which, if not all-encompassing, at least briefly described its major subjects."]; *ibid*. ["[T]he Committee's ballot summary, while technically imprecise, omitted only auxilliary [*sic*] or subsidiary matters, fairly represented the measure and thus was in substantial compliance with the law."].)  In particular, there is no requirement that the analysis attempt to describe every way in which a measure may change the law; rather it "*may* contain background information, *including the effect of the measure on existing law*." (Elec. Code, § 9087, subd. (b), italics added.)  The Analyst is thus called upon only to make a rational judgment about what effects are *most likely to matter to voters*, and to describe them in a fair and intelligible way.  Given the limited number of persons affected by the use of "this Code" in section 1170.18(c), it seems entirely likely that the Analyst failed to mention it not out of ignorance or neglect but because it was expected to matter less to voters than other features of the measure.

Assuming the Legislative Analyst does not find a given effect sufficiently material to warrant mention, the burden then falls to the official proponents and opponents of a measure to highlight any effects that they believe (1) may otherwise escape voters' attention, and (2) may affect the vote of a significant number of electors.  To be sure, determining what effects to mention in these arguments may require an even more radical triage than is required of the Legislative Analyst.  Official ballot arguments are apparently restricted to 500 words for opening and 250 words for rebuttal.  (See Elec. Code, §§ 9062, 9069, cf. *id*., § 9041.)  This means the advocates must select a limited number of points to include in the official argument, relying on other modes of communication for any other points they believe may induce voters to cast a ballot in their favor.

I believe that courts are constrained by the separation of powers to trust not only the ballot contents, but arguments in the public arena, to ensure that the text of adopted measures reflects the actual will of the voters.  Here the evidence suggests that at least

23

two of the official opponents of Proposition 47 were entirely aware of its effect on Proposition 36 petitions but *elected not to cite that effect in the ballot pamphlet* as a reason to vote no, relying instead on public media to bring it to voters' attention. Two of the three opposition authors named in the ballot pamphlet are Christopher W. Boyd, president of the California Police Chiefs Association (CPOA), and Gilbert G. Otero, president of the California District Attorneys Association (CDAA). (Ballot Pamp., General Elec. (Nov. 4, 2014), argument against Prop. 47, p. 39; [web cite].) CPOA is identified by the Secretary of State as a contributor to the lead opposition entity, Californians Against Proposition 47 (CAP47). (California Secretary of State – CalAccess – Campaign Finance <http://cal-access.ss.ca.gov/Campaign/Committees/ Detail.aspx?id=1368083&session=2013&view=received> (as of Mar. 11, 2016).) Among the materials of which defendant seeks judicial notice is a printout of a page, published prior to the 2014 election, from CAP47's website.[11] That page recapitulates portions of what it describes as an "extensive evaluation of Proposition 47 from the [CDAA]." It seems to have drawn most of its content verbatim from the CDAA "evaluation."[12] It reports that, according to the CDAA, Proposition 47 would "impose an impossibly demanding standard of proof in resentencings, *including the three strikes resentencings enacted in 2012's Proposition 36*." (Italics added.) Later it elaborates on this asserted failing: "[T]his proposed new definition of 'dangerousness' . . . *applies to*

---

[11] The page can no longer be found at its original web location, but a version archived on October 10, 2014, may be viewed at Californians Against Prop. 47 | About Proposition 47 <https://web.archive.org/web/20141010054701/http:// californiansagainst47.com/about-proposition-47/> (as of Mar. 11, 2016).

[12] The CDAA paper is not available to nonmembers on CDAA's own website. Apparent copies, however, can be found at two other web addresses. (See Proposition 47: A Cruel Fraud <http://docplayer.net/1464582-Proposition-47-a-cruel-fraud.html> (as of Mar. 11, 2016); Proposition47_A_Cruel_Fraud.pdf <http://www.co.mendocino.ca.us/ da/pdf/Proposition47_A_Cruel_Fraud.pdf> (as of Mar. 11, 2016).)

*any resentencing permitted by the Penal Code . . . . By referring to 'Code,' § 1170.18 would alter the meaning of 'unreasonable risk of danger to public safety,' not only as it is applied in § 1170.18 resentencing hearings, but in all other hearings that rely on the dangerousness standard throughout the entire Code. . . .* [¶] Moreover, for any of the Three Strikes defendants previously denied resentencing based upon a judicial finding of dangerousness, may appeal that ruling and *request the court now apply this new standard of dangerousness*, resulting in a further cost to a court system already struggling financially." (Italics added.)

In short, one opposition author was president of an organization that wrote a paper specifically citing the effect on Proposition 36 petitions, and another was president of an organization that contributed to an entity whose website highlighted that effect as a reason to vote no. Their failure to cite this effect in the ballot pamphlet supports an inference, not that the effect was too obscure to be noticed, but that opponents did not think it a powerful enough argument for inclusion in the limited space available to them. This in turn suggests that by invalidating the plainly expressed will of the voters, the courts are handing opponents of the measure a victory they could not, and knew they could not, win at the ballot box.

I simply do not believe it is the office of the courts to protect voters, if that is what they think they are doing, from the legal consequences of their votes. Such an approach is doubly objectionable where, as here, it appears that voters had knowledge, or at least notice, of those consequences. In the absence of absurdity, constitutional infirmity, or frustration of an *affirmatively manifested* purpose, a voter-adopted statute must be given effect according to its plain meaning. I therefore can no longer join in the chorus of judicial voices that have sought to frustrate the intent of the 2014 electorate as manifested by them in the only way that matters.

25

## VIII. *Timing Considerations*

The majority also concludes that "practical reasons" weigh against applying "throughout this Code" literally because "[i]t is illogical to conclude that Proposition 47 was meant to modify the Reform Act when most of the three strike resentencing petitions were already adjudicated and decided by that time." (Lead opn. at p. 21.) The basis for this assertion is not clear. One possible argument is that (1) the time to file Proposition petitions would have nearly expired when Proposition 47 took effect; (2) because of this, few if any such petitions were likely to remain "[un]adjudicated and [un]decided" at that time; (3) the new definition could only apply to petitions that remained unadjudicated and undecided; (4) extending the new definition to Proposition 36 petitions would therefore be futile; therefore (5) voters could not have intended a futile act.

If this is the underlying reasoning, I find it badly flawed. The first premise fails because Penal Code section 1170.126, subdivision (b), permits an eligible prisoner to "file a petition for a recall of sentence, within two years after the effective date of the act that added this section *or at a later date upon a showing of good cause*." Voters could well anticipate, and I would be inclined to hold, that a change in law requiring the petitioner's more-or-less immediate release from prison constitutes "good cause" to entertain a petition beyond the two-year deadline.

The second premise fails because there are many cases like this one in which the defendant's Proposition 36 petition remains pending on appeal and has thus not been *finally* adjudicated or decided. Voters could well anticipate that *at least* these petitioners would be able to avail themselves of the change in law occasioned by section 1170.18(c). To suppose otherwise is to assume that they did not intend the measure to have any retroactive effect—a point the majority professes not to address. (See Lead opn., p. 22, fn. 9.)

26

I will concede the third premise, for present purposes, to this extent: there may indeed be no procedure by which, on November 4, 2014, a prisoner could mount a challenge, based upon the change in law effected by section 1170.18(c), to the denial of a Proposition 36 petition *that had been denied in the trial court and had passed beyond the time for appellate review*. (See 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Judgment, § 193, pp. 238-240 [writ of error coram nobis (motion to vacate)]; 3 Witkin & Epstein, *supra*, Punishment, § 394, pp. 608-609 [ordinary motion to recall sentence]; 6 Witkin & Epstein, *supra*, Criminal Writs, § 45-66, pp. 655-684 [grounds for habeas corpus]; cf. *In re Estrada* (1965) 63 Cal.2d 740, 744-745 [inference that legislative reduction in punishment was intended to benefit all defendants whose convictions were not yet final].) But the argument fails without or without the third premise, so long as Proposition 36 denials *still pending on appeal* would be subject to correction based on the change in law effected by section 1170.18(c). If that is true, the fourth premise also collapses and the fifth with it.

Whatever the logical underpinnings of the majority's treatment on this point, I cannot accede to any suggestion that the number of persons to be affected by a statute can justify abrogation of its unambiguous terms. Even if only a handful of cases were likely to be affected, it would furnish no occasion to disregard the plain meaning of the statute. To posit a regime in which courts are empowered to disregard legislative directives on the ground that their effects are too insignificant to have been intended is, yet again, obnoxious to the proper separation of powers. It is not for the courts to decide what objectives are sufficiently weighty to merit legislative attention. Least of all does it fall to the courts to decide when a court may abrogate legislation touching on a fundamental right such as physical liberty because it finds the number of citizens benefiting from it too small to bother with.

Here, as already noted, it can be readily inferred from the very existence of section 1170.18(c) that its purpose was to correct what the drafters saw as an undesirable judicial interpretation and application of Proposition 36. Once the prior regime was perceived as unsatisfactory, it was entirely logical not only to create a new regime but to extend its benefit to anyone still seeking relief under its predecessor. The logic of doing so is the same whatever the size of the class so benefited. Lawmakers are under no obligation to count heads before deciding whether to remedy perceived defects in existing law. They may act on the basis of one or two cases, or for that matter anecdotes, concerning an undesirable consequence of existing law. They are fully empowered to adopt corrective measures whether the class of those benefited proves to count a million, a hundred, or one. Nor is there anything "illogical" about extending a remedy to less than the entire universe of persons to whom it might have been extended. Logic does not demand that all aboard must drown merely because there are too few life rafts for everyone.

Finally, I find the reasoning under scrutiny to be self-contradictory. It imputes to voters a refined calculus about the effect of their enactment on Proposition 36 petitions, but then supposes that they must have considered that effect too trivial to pursue. Of course, if voters indeed understood the effect of section 1170.18(c) and did not wish to bring that effect about, they would have defeated the measure. To overturn the unambiguous words they enacted on the ground that they understood what the language of the measure would accomplish, but did not intend it, is to adopt a mode of statutory construction I have never seen before and cannot join in introducing to our law.

## IX. "Savings Clause"

The majority finds tension between the literal meaning of section 1170.18(c) and a provision in Proposition 47 declaring that "[n]othing in this and related sections is intended to diminish or abrogate the finality of judgments in any case not falling within

28

the purview of this act." (Pen. Code, § 1170.18, subd. (n) (§ 1170.18(n)).) According to the majority, "Applying the definition of 'unreasonable risk of danger to public safety' from section 1170.18 to section 1170.126, would undoubtedly *diminish the finality* of those three strikes judgments that do not involve a nonserious, nonviolent property or drug crime." (Lead opn. at p. 21, italics added.) I cannot agree. There is no reason to suppose section 1170.18(n) was intended to preclude application of section 1170.18(c) "throughout this Code" in accordance with its terms. Indeed, insofar as section 1170.18(c) applies to Proposition 36 cases, those cases "fall[] within the purview of this act" and are thus exempt from the operation of section 1170.18(n).

Neither the intent nor the letter of section 1170.18(n) is frustrated by applying section 1170.18(c) to Proposition 36 cases, at least where the judgment in those cases has not passed beyond the power of the courts to modify. The plain meaning and manifest purpose of the quoted provision is to prevent a construction of Proposition 47 that operates to *reopen proceedings* in matters falling outside section 1170.18. Here, the proceeding has been reopened, and is still open, but not by virtue of Proposition 47. It is Proposition 36 that, by authorizing resentencing in cases like this one, has "diminish[ed] or abrogate[d] the finality" of the judgment before us. The only effect of Proposition 47 is to provide a rule of decision on a subsidiary issue, i.e., whether to deny relief on grounds of dangerousness. Defendant is not relying on Proposition 47 to attack the judgment. He is invoking section 1170.18(c) to provide the rule of decision for a subsidiary issue because that is what the cited section mandates. Complying with that mandate does not "diminish or abrogate" the original judgment, even if it proves dispositive of the Proposition 36 petition. It is still Proposition 36, not 47, that impairs the finality of defendant's sentence.

Had the drafters and voters intended to achieve the result urged by the majority, they could have simply done what the court has now done on their supposed behalf:

29

replaced "throughout this Code" with "in this act" in section 1170.18(c). I would give effect to all of the language chosen by the voters, including the directive that section 1170.18(c)'s definition of dangerousness govern determinations of that issue in Proposition 36 proceedings.

## X. *Presumptions Favoring Literal Construction*

The majority's construction of section 1170.18(c) runs afoul of at least two familiar presumptions concerning the interpretation of doubtful statutory provisions. One dictates that *remedial* statutes such as Proposition 47 are to be *broadly construed in favor* of parties invoking their terms. (See *People v. Zeigler* (2012) 211 Cal.App.4th 638, 658 ["The Proposition 36 statutory scheme is clearly remedial in nature and . . . , "under well-settled rules of judicial construction, such a statute is to be liberally construed to promote the objects to be accomplished by it.' "]; *People v. Rivas-Colon* (2015) 241 Cal.App.4th 444, 451, quoting *People v. Sherow* (2015) 239 Cal.App.4th 875, 880 ["Section 1170.18 is a 'remedial statute[.]' "].) Indeed, two uncodified sections of Proposition 47, and one of Proposition 36, explicitly dictate such a construction. (See 3 West's Session Laws (2013-2014), pp. A-20 – A-21, §§ 15, 18; 3 West's Session Laws (2011-2012), p. A-53, § 7.)

The other presumption directs that in the absence of more reliable guidance, doubtful provisions of *penal* statutes are to be construed in favor of the defendant. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1481 ["Where the statute is susceptible of two reasonable constructions, a defendant is ordinarily entitled to that construction most favorable to him."].) If this rule does not apply here, it is only because section 1170.18(c) contains no ambiguity that the presumption can operate to resolve. (See *ibid.*; *People v. Ramirez* (2014) 224 Cal.App.4th 1078, 1085 ["The rule of lenity applies as a tie-breaking principle where ' " 'two reasonable interpretations of the statute stand in relative equipoise.' " ' [Citation.] Where that situation exists, the court must 'prefer the

30

interpretation that is more favorable to the defendant.' [Citation.]"].) Here there is just one literal meaning. But if the majority's reading of the statute did stand in "relative equipoise" with the plain meaning of the statute (*People v. Ramirez, supra,* 224 Cal.App.4th at p. 1085), this presumption would militate in favor of the latter.

***Conclusion***

I see no colorable basis here to depart from the plain terms enacted by the voters. I would reverse the judgment with directions to reevaluate the petition in light of the definition of dangerousness set forth in section 1170.18(c).

_____
RUSHING, P.J.

Filed 3/25/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040327 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C9890809) |
| v. | |
| JOHN PAUL FLOREZ, | |
| Defendant and Appellant. | |

BY THE COURT:

      The opinion which was filed on March 14, 2016, is certified for publication.

_____
                Premo, J.

_____
                Rushing, P.J.

_____
                Elia, J.

      The written opinion which was filed on March 14, 2016, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is therefore ordered that the opinion be published in the official reports.

Dated: _____
                _____
                Rushing, P.J.

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. C9890809 |
| --- | --- |
| Trial Judge: | Hon. Hector E. Ramon |
| Counsel for Plaintiff/Respondent:<br>The People | Kamala D. Harris<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Catherine A. Rivlin<br>Supervising Deputy Attorney General<br><br>Allen R. Crown<br>Deputy Attorney General |
| Counsel for Defendant/Appellant:<br>John Paul Florez | Under appointment by the Court of Appeal<br>Michael Satris |

People v. Florez
H040327